# 24-323

## In the
## United States Court of Appeals
### For the Second Circuit

JUAN J. JIMENEZ,

*Plaintiff-Appellant,*

– v. –

CITY OF NEW YORK, HUGH BOGLE, DERBY WANCCIQUE,
PASCALE DENIS, VIVENE SIMPSON, GLORY OKEZIE
and DERMOT F. SHEA,

*Defendants-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF NEW YORK

## BRIEF AND SPECIAL APPENDIX FOR
## PLAINTIFF-APPELLANT



BARKET EPSTEIN KEARON ALDEA & LoTURCO, LLP
*Attorneys for Plaintiff-Appellant*
666 Old Country Road, Suite 700
Garden City, New York 11530
(516) 745-1500

## **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ................................................................. iii

STATEMENT OF JURISDICTION .......................................................... 1

STATEMENT OF ISSUES PRESENTED FOR REVIEW ..................................... 1

STATEMENT OF THE CASE ................................................................ 2

    B.M.'s Report to the School Guidance Counselor .......................................... 2

    During the Forensic Interview, B.M. Admitted that She "Usually"
    Lies, Would Lie during the Interview, and Never Promised to
    Provide Truthful Answers to All Questions Asked ........................................ 3

    B.M.'s Statements About Lying Were Omitted from Detective
    Denis's Paperwork Documenting the Details of the Forensic Interview ........ 7

    The Lack of Any Independent Corroboration of B.M.'s Allegations ............ 9

    B.M.'s Interview at the Kings County District Attorney's Office ............... 10

    The Arrest and Prosecution .......................................................... 11

    The Family Court Case ............................................................... 11

    The Findings Following Plaintiff's Departmental Trial ............................ 14

    The Summary Judgment Motion and the Court's Decision ......................... 15

SUMMARY OF THE ARGUMENT ...................................................... 17

STANDARD ............................................................................... 18

i

ARGUMENT

THE DISTRICT COURT ERRED IN GRANTING DEFENDANTS SUMMARY JUDGMENT ON GROUNDS OF QUALIFED IMMUNITY BASED UPON A DEFENSE-FRIENDLY CONSTRUCTION OF THE FACTS AND IN CONTRAVENTION OF CLEARLY-ESTABLISHED LAW...................................................19

    A. The Defendants Lacked Both Actual and Arguable Probable Cause ......19

    B. The Defendants Were Not Entitled to Qualified Immunity on Summary Judgment ...................................................................................25

    C. The District Court Erred in Relying Upon *Doe v. Pisani*, 2023 WL 4240987 (2d Cir. 2023) ...........................................................27

CONCLUSION ...........................................................................................32

# TABLE OF AUTHORITIES

**Page**

**Cases:**

*Allen v. Leonard,*
  2020 WL 4587752 (E.D.N.Y. 2020)....................................................20, 24, 28

*Annan v. City of New York Police Dept.,*
  2015 WL 5552271 (E.D.N.Y. 2015)................................................................25

*Brown v. Ristich,*
  36 N.Y.2d 183 (1975) .....................................................................................22

*Curley v. AMR Corp.,*
  153 F.3d 5 (2d Cir. 1998)................................................................................18

*Dickerson v. Napolitano,*
  605 F.3d 732 (2d Cir 2010).......................................................................19, 28

*Doe v. Pisani,*
  2023 WL 4240987 (2d Cir. 2023)..........................................16, 27, 28, 30, 31

*Escalera v. Lunn,*
  361 F.3d 737 (2d Cir. 2004)............................................................................30

*Gisondi v. Town of Harrison,*
  72 N.Y.2d 280 (1988) .....................................................................................30

*Manganiello v. City of New York,*
  612 F.3d 149 (2d Cir. 2010)......................................................................20, 21

*McGee v. Doe,*
  568 Fed. Appx. 32 (2d Cir. 2014)..............................................................26, 27

*Minfee v. City of New York,*
  2021 WL 3565864 (E.D.N.Y. 2021)................................................................20

*Mistretta v. Prokesch,*
  5 F. Supp. 2d 128 (E.D.N.Y. 1998) ................................................................19

*Pal v. Cipolla,*
2022 WL 766417 (2d Cir. 2022)......................................................26

*Panetta v. Crowley,*
460 F.3d 388 (2d Cir. 2006)................................................20, 24, 27

*People v. McDaniel,*
165 A.D.2d 817 (2d Dept. 1990) .....................................................22

*R.B. Ventures, Ltd. v. Shane,*
112 F.3d 54 (2d Cir. 1997)................................................................18

*Rivas-Villegas v. Cortesluna,*
595 U.S. 1 (2021).............................................................................25

*Rodriguez v. City of N.Y.,*
72 F.3d 1051 (2d Cir. 1995)..............................................................18

*Sankar v. City of New York,*
867 F.Supp.2d 297 (E.D.N.Y. 2012) .........................................20, 24

*Sherman v. City of New York,*
2019 WL 2164081 (E.D.N.Y. 2019)................................................20

*Simons v. Fitzgerald,*
287 Fed. Appx. 924 (2d Cir. 2008) ..................................................25

*Singer v. Fulton County Sheriff,*
63 F.3d 110 (2d Cir 1995)..........................................18, 20, 24, 27

*United States v. Laurent,*
861 F. Supp2d 71 (E.D.N.Y. 2011) .................................................22

*Walczyk v. Rio,*
496 F.3d 139 (2d Cir. 2007)............................................................28

*Zellner v. Summerlin,*
494 F.3d 152 (2d Cir. 2007).............................................................25

iv

## **Rules, Laws and Statutes:**

28 U.S.C. §1291 ..................................................................................1

28 U.S.C. §1331 ..................................................................................1

Rule 56.1 ............................................................................................2

United States Code, Section 1983 ...................................................1, 25

## BRIEF FOR PLAINTIFF-APPELLANT

## STATEMENT OF JURISDICTION

The Eastern District of New York had federal question jurisdiction over the False Arrest and Malicious Prosecution Claims because they were brought pursuant to federal law—namely, Title 42, United States Code, Section 1983. *See* 28 U.S.C. §1331 ("The district courts shall have original jurisdiction of all civil actions arising under the … laws … of the United States").

This Court has jurisdiction over this case pursuant to 28 U.S.C. §1291. Pursuant to Fed. R. App. P. 4, Plaintiff's Notice of Appeal was timely filed on February 5, 2024 (JA 1013), within 30 days of the final order and judgment entered in the Eastern District of New York on January 19, 2024, disposing of all of the parties' claims in this case (JA 1012).

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

The District Court decided at summary judgment that Defendant-officers had arguable probable cause to arrest and prosecute Plaintiff and were, thus, entitled to qualified immunity, despite their reliance solely on the uncorroborated report of a complainant who refused to agree to tell the truth and indicated that she was a habitual liar, and the existence of other available evidence refuting her account. In the process, the court construed the evidence in the light most favorable to the summary judgment movants rather than to the Plaintiff-Appellant, and buttressed its

holding with inapposite case law relating to situations where arrest occurred only after a probable-cause determination had been independently made by a neutral magistrate who issued a warrant—which did not occur here. Under these circumstances, should the District Court's grant of summary judgment be vacated and the case permitted to proceed to trial?

## STATEMENT OF THE CASE

### B.M.'s Report to the School Guidance Counselor

On September 25, 2019, 12-year-old B.M. asked her school Guidance Counselor "how someone could get arrested" (JA 51).[1] She then claimed that at some point during the summer, she was in her neighbor's apartment, under the same roof as his wife and kids, when he groped her, tried to kiss her, and threatened to "dry hump" her (JA 51, 83, 508). B.M. was unable to provide the apartment number and did not give a description of her neighbor except to say that he was a detective (JA 51, 83).

B.M.'s guidance counselor reported the accusation to the police (JA 51, 83, 508). After it was determined that Detective Juan Jimenez lived in B.M.'s building,

---

[1] Citations to "JA" refer to pages in the Joint Appendix filed in connection with this brief. In support of their Statement of Undisputed Material Facts Pursuant to Rule 56.1 and their Reply memorandum, Defendants attached portions of transcripts of the depositions of the witnesses' testimony (JA 66-69, 926-987). However, Defendants' citations in their Rule 56.1 Statement refer exclusively to time stamps of the non-recorded video conferences of the respective depositions of those witnesses and, consequently, the citations do not correspond with their exhibits.

2

Detective Pascale Denis of the Internal Affairs Bureau of the New York City Police Department ("IAB"), was assigned to the investigation (JA 51, 71, 83, 104, 508).

### During the Forensic Interview, B.M. Admitted that She "Usually" Lies, Would Lie during the Interview, and Never Promised to Provide Truthful Answers to All Questions Asked.

On September 25, 2019, Detective Denis and Sergeant Derby Wancique of Group 41, IAB, proceeded to the Brooklyn Child Abuse Center for the purpose of listening to an interview of B.M. by Christine Fazio, of Safe Horizons (JA 52, 207-08, 584-87, 599-600). The interview lasted 1 hour and 16 minutes, during which B.M. often smiled when answering questions, avoided eye contact, was easily distracted, laughed, and though discussing serious allegations, did not seem upset (Video of Interview).[2]

Ms. Fazio asked B.M. a series of questions that probed B.M.'s ability to tell the truth (JA 209-210; Video Interview at 13:48-16:08). Specifically, Ms. Fazio began by asking B.M. if she could "promise" to tell the truth, asking "Do you feel like you can promise me to tell the truth?" (JA 52-53, 210; Video Interview at 13:43-13:57). B.M. could not. While smiling, she answered, "I don't. I don't know. It depends what it is" (JA 53, 510, Video Interview at 13:58-14:05).

---

[2] The disc containing the video of the interview, which was attached to Defendants' Affidavit and Declaration in Support of their Summary Judgment Motion as Exhibit E (*see* JA 67, fn 1) and is part of the record on appeal, is being provided to this Court separately, as it cannot be uploaded with the Appendix.

Continuing to drill down on B.M.'s willingness to tell the truth, Ms. Fazio undertook multiple attempts to gain a basic pledge of honesty from B.M.—all of which were unsuccessful. She asked B.M. whether, if she decided to answer a question, she would "promise the answer you give me will be true" (JA 53, 511; Video Interview at 14:09-14:53). B.M. declined to make that commitment. Instead, she answered, "I don't understand" (JA 53; 511; Video Interview at 14:54-14:56). Ms. Fazio made another attempt to secure this basic commitment to truth, asking: "Okay so if I ask you a question, and you answer it, will the answer—do you promise the answer you give me will be true" (JA 52, 511; Video Interview at 14:48-15:08). But smiling, B.M. refused to give a clean answer to the simple question—answering in the affirmative followed by, "[d]epending on what the question is" before ultimately relenting, "I'm not sure" (JA 53, 511; Video Interview at 15:08-15:15). Given the seriousness of the interview and allegations, Ms. Fazio did not give up. "So it's – will there be a time when you would tell me a lie or tell me not the truth?" (Video Interview at 15:13-5:20). "Yes," B.M. replied, affirmatively acknowledging that she would, in fact, lie to Ms. Fazio; qualifying, with a smile, "I am being honest" (JA 53, 512; Video Interview at 15:19-15:22).

Realizing that B.M. would simply not commit to telling the truth, Ms. Fazio gave up on securing that commitment and instead wondered why telling the truth was hard for B.M. (Video Interview at 15:24-15:25). B.M. responded that she

doesn't "usually tell the truth" (JA 53, 512; Video Interview at 15:27-15:29) even though she knows that lying "causes consequences" (JA 553, 997-98; Video Interview at 15:30-15:49).[3]

Finally, Ms. Fazio said, "Okay. So I accept that. I can't make you say one way or the other. I would *only ask* that. . . *if* there's something you *don't want to answer* rather than telling me something that's not the truth, just tell me I don't wanna say that word." B.M. responded "Uh-huh." (JA 53-54, 513 [emphasis added]; Video Interview at 15:51-16:05). Ms. Fazio asked, "Does that sound fair?" and B.M. said, "Yes" (JA 54, 514; Video interview at 16:05-16:08). Notably, B.M. did not ever agree to tell the truth about topics she *did want* to discuss—like her accusations about her neighbor.

B.M. then proceeded to make false allegations about her neighbor, Plaintiff-Appellant, Juan Jimenez. B.M. claimed that after she put Plaintiff's kids to bed, he accosted her and demanded a kiss, but B.M. said no and made a joke that his "breath stinks" before Plaintiff kicked her out of his house for no reason (JA 54; Video Interview at 24:17-26:01). B.M. then added an additional flair: "[o]h, he always grabs my butt. . ." (JA 54; Video Interview at 26:16-26:21).

---

[3] In their submission to the District Court, this was misquoted by Defendants as "causes *conflicts*" (JA 53, 997) (emphasis added).

Later in the interview, B.M. continued to unwind her narrative. She added that Plaintiff had also tried to pull her bra down—or he took it off—and was squeezing her chest (JA 55; Video Interview at 53:51-54:44). When pressed as to when this occurred, B.M. suggested it had happened the prior summer (Video Interview at 1:04:35-1:05:20). B.M. claimed that Plaintiff also "tries to pull my pants down" (JA 54; Video Interview at 26:58-27:07), once ripped her pants (JA 55; Video Interview at 33:49-34:25), and tried to pull her bra down, too (Video Interview at 27:10).

Regarding her allegation that Plaintiff tried to dry hump her, B.M. stated it happened on the bed while Plaintiff had his clothes on and was pushing (JA 55; Video Interview at 31:36-32:51; 42:38-43:52). But B.M. later claimed the dry humping happened at other times, like whenever Plaintiff's wife would go to the bathroom (Video Interview at 32:17-32:24). Or on one occasion, B.M. said, Plaintiff was trying to hump her on the bed in front of B.M.'s 8-year-old cousin (Video Interview at 31:46-32:00) and had done so in front of his kids, as well, who were "trying to take him off" of her (Video Interview at 43:00-43:03; 43:40-43:52).

B.M. spontaneously asked Ms. Fazio if she should tell her about the beach incident, and then claimed that she once went to the beach with Plaintiff and his wife and kids (Video Interview at 36:02-36:55), where Plaintiff recorded B.M. and made comments about B.M.'s waistline to his wife (Video Interview at 41:05-41:08;

41:22-28; 41:31-35). According to B.M., Plaintiff allegedly hugged B.M. from behind, and "wasn't even paying attention to his wife … but he was like kissing [his wife] and stuff" (Video Interview at 42:30-42:38).

B.M. also claimed that Plaintiff would text her, including "I love you" (Video Interview at 56:01-56:16). But she also acknowledged that she asked for Plaintiff's Snapchat, which he refused to give her (Video Interview at 1:11:14-1:11:21), and that she wanted to connect with Plaintiff on WhatsApp but he blocked her and told her to stop because she was "annoying him" (Video Interview at 56:55-57:07). B.M. further alleged that Plaintiff gave her sneakers, toys, and money (JA 55; Video Interview at 59:40-1:00:28). But, she confessed, the toys were given to B.M. to play with Plaintiff's daughter (Video Interview at 59:54-1:00:04). And she ultimately clarified that some money was for an emergency, in case she got lost with Plaintiff's daughter at the movies and needed to take a cab (Video Interview at 1:00:19-1:00:29). The only other money Plaintiff gave to her, she ultimately acknowledged, was a birthday gift (Video Interview at 1:00:40-1:00:51).

### B.M.'s Statements About Lying Were Omitted from Detective Denis's Paperwork Documenting the Details of the Forensic Interview

Neither Detective Denis nor Sergeant Wancique took notes during their observations of the forensic interview (JA 558-60; 624-26). Both Detective Denis and Sergeant Wancique heard B.M. refuse to commit to tell the truth yet denied there was any issue regarding B.M.'s credibility (JA 545-46, 566-67, 626). Instead, in

7

filling out her investigative reports, worksheets 2D and 4, Detective Denis simply omitted the critical facts that B.M. had refused to tell the truth and had affirmatively stated that she expected to lie (JA 87; 11-113; 559-60, 673, 676).

Inspector Hugh Bogle, the Internal Affairs Bureau's Commanding Officer, and Former Chief of Criminal Investigations Alan B. Cooper, agreed that details related to a complainant's credibility—including a propensity to lie—were important considerations in deciding whether probable cause existed for an arrest and should have been included in Denis's reports (JA 673-77, 695-97, 941). Investigators were, of course, expected to consider credibility as part of their investigation into allegations of misconduct (JA 672). Yet neither Bogle nor Cooper watched the video of the forensic interview before Plaintiff's arrest (JA 668-69, 672, 932-933, 941), and Bogle had no recollection that anyone in his unit had told him about B.M.'s refusal to pledge her honesty (JA 667-68, 670, 682-83).[4]

When there are issues regarding credibility, the police are supposed to try to corroborate the allegations "if you can" (JA 672, 680), confirmed Inspector Bogle. If the police are unable to independently corroborate allegations when there is a credibility issue, then lack of corroboration would be a factor in assessing whether

---

[4] Inspector Bogle testified that after first seeing the video in connection with his deposition for this pending lawsuit, it did not change his view that probable cause had been established "because sometimes kids tell stories" (JA 942). Chief Cooper was never informed of B.M.'s discussion about lying (JA 932-33).

the probable cause standard had been met (JA 680-81). And, if a witness is not credible, the police may not have probable cause (JA 681).

In cases in which the police determine that the victim is not credible, the allegations are considered "unsubstantiated" (JA 682). This determination is made on a global understanding of all the facts and circumstances, which is why it was important to document and review the complainant's statements to the interviewer about lying (JA 682).

**The Lack of Any Independent Corroboration of B.M.'s Allegations**

Sergeant Wancique had no experience investigating a sex crime case and Detective Denis did not take the sex crime course training that is offered to members of the Special Victim's Unit (JA 630, 632, 979). They did not obtain independent corroboration regarding any of the allegations in B.M.'s forensic interview. They did not believe there were witnesses—despite B.M.'s statements that, on several occasions, there had been witnesses—and due to the "timing of her outcry" they did not believe there would be any physical evidence (JA 111, 562-64, 568-69, 572, 574-75, 627-28, 673).

Detective Denis had included in Worksheet 2D that B.M. alleged Plaintiff had made an inculpatory recording of her on the beach; but Denis did not seek to obtain

evidence from Plaintiff's phone to see if such a recording existed (JA 569-70).[5]

Inspector Bogle did not recall that they obtained information from Plaintiff's phone

either (JA 683).

### B.M.'s Interview at the Kings County District Attorney's Office

On September 27, 2019, Assistant District Attorney ("ADA") Christopher

Mirabella watched B.M.'s forensic interview and personally interviewed B.M. (JA

119, 230, 246, 249, 735, 982).[6]  It was not the practice of the District Attorney's

Office to advise the police on probable cause and, therefore, ADA Mirabella did not

tell Detective Denis or Sergeant Wancique that there was probable cause to arrest

Plaintiff.  Nor did he otherwise authorize the arrest (JA 735-36, 738, 993-94).

Likewise, Sergeant Wancique testified that the police make the probable cause

determination, not the prosecutor (JA 119-20, 634).

---

[5] The investigative log has entries referencing Plaintiff's Instagram account, that a department phone was submitted to "ITB," and a notation about a "consent form to search" but there was no testimony about these entries (JA 71-72).

[6] ADA Mirabella was not concerned about B.M. admissions about lying "[b]ecause everybody lies to some degree" and he thought Ms. Fazio had addressed it by telling B.M. that she should decline to answer a question, rather than lying (which Ms. Fazio had not done) and by "confirming that the child understood that she had to tell the truth within the context of the interview" (which B.M. did not do) (JA 248-49, 255, 735).

**The Arrest and Prosecution**

On September 27, 2019, Inspector Bogle authorized Sergeant Wancique to arrest Plaintiff (JA 229-30, 750).[7]  That same day,  Detective Denis signed the felony complaint, charging Plaintiff with Sexual Abuse in the First Degree, Forcible Touching, Endangering the Welfare of a Child, and Sexual Abuse of a Minor in the Second Degree based on a single incident, alleged to have occurred sometime between July 23, 2019 and September 14, 2019,  in which Plaintiff allegedly grabbed B.M. by the waist, attempted to kiss her on the mouth, and grabbed her buttocks with his hand (JA 230, 573, 753).

On September 27, 2019, Plaintiff was arraigned, released, and issued a limited order of protection in favor of B.M. (JA 233-34).  Subsequently, after hearing the evidence, the Grand Jury voted not to indict Plaintiff (JA 91).  On March 26, 2020, Plaintiff's criminal case was dismissed (JA 91).

**The Family Court Case**

Child Protective Specialist Gloria Okezie from the Administration for Child Services ("ACS") had also observed B.M.'s forensic interview (JA 52, 103-04, 106-08, 111, 510, 556-557, 624).   After listening to B.M.'s forensic interview on September 25, 2019, Ms. Okezie did not disclose to her supervisor, Viviene

---

[7] Chief Cooper authorized Inspector Bogle to have Plaintiff arrested (JA 278).

Simpson, B.M.'s disclosure about lying and did not memorialize it in her notes (JA 155-58, 656, 728-29).

That same day, Ms. Okezie interviewed B.M.'s parents, Jorge Mendez and Gilda Inoa, who stated that they did not believe B.M.'s allegations (JA 654, 657, 660). Specifically, B.M.'s mother told Ms. Okezie that B.M. lies and sometimes B.M. would "say something then say the other" (JA 654, 660). B.M.'s father also did not believe B.M. (JA 654-55).[8] Ms. Okezie reported to Ms. Simpson that B.M.'s parents did not believe her (JA 722-23).

On October 1, 2019, ACS held a Child Safety Conference regarding B.M.'s allegations with Ms. Simpson, Ms. Okezie, and B.M.'s parents (JA 416-18). It was noted in the conference sheet that B.M.'s parents did not believe the allegations (JA 416).[9] At the conclusion of the conference, the safety intervention recommended that ACS file an Article 10 Petition against Plaintiff and obtain a full order of protection against him in favor of B.M. (JA 417).

On October 1, 2019, ACS also hosted a Child Safety Conference regarding Plaintiff's children, even though there was no allegation or evidence that Plaintiff's two children were abused (JA 110, 165-66,168, 419-21, 703-09, 714-19, 721, 755-

---

[8] Ms. Okezie testified that B.M.'s father had also said that B.M. does not lie, which was inconsistent with his other statements (JA 655).

[9] A memo included in the prosecutor's file indicated that on October 1, 2019, Ms. Okezie also learned that B.M. had recanted, admitting that she had been lying about the allegations (JA 234).

767).  It was ACS's practice to file a petition based upon derivative allegations, which here involved B.M.'s allegations (JA164, 705-10).  The "safety intervention" recommended that ACS also file Article 10 Petitions for Plaintiff's children and obtain a full order of protection against Plaintiff in favor of them (JA 417).  Accordingly, based upon B.M.'s derivative allegations, on October 1, 2019, an ACS attorney filed Article 10 Petitions regarding each of Plaintiff's children (JA 110, 164, 480, 706, 709, 712-15).

On or about October 3, 2019, after the petitions were filed, Plaintiff's two minor children were forensically interviewed at the Brooklyn Child Advocacy Center (JA 703-06, 715, 754-767).[10]  Neither child stated that they were sexually abused (JA 704, 708-09, 714).

On September 20, 2020, both Article 10 petitions involving Plaintiff's children were dismissed without prejudice by the Honorable Ben Darvil Jr. because the petitions were withdrawn (JA 485-86, 786-89).  And on September 24, 2021, Administrative Law Judge Brooke A. Clarke ruled that ACS did not establish by a fair preponderance of the evidence that Plaintiff committed maltreatment and/or abuse of his children (JA 792-94).

_____

[10] While Plaintiff stated this fact below, Defendants cited to Exhibit K at "DEF 970-DEF 990" to support this factual assertion (JA 60).  That exhibit does not contain pages marked DEF 980 through DEF 990, and DEF 979 appears to be a reference to the interview of B.M. and not Plaintiff's children.  Ms. Simpson's testimony indicates that the interview involving Plaintiff's children occurred on October 4th and not the 3rd (JA 703-04, 715).

### The Findings Following Plaintiff's Departmental Trial

A disciplinary case was brought against Plaintiff by the New York City Police Department for two charges and specifications, one of which related to B.M.'s allegations of sexual abuse (JA 489, 491).[11]  On July 6, 2021, Plaintiff went to a departmental trial for, *inter alia*, the sexual abuse allegations regarding B.M. (JA 492-94).

At the conclusion of the trial, Assistant Deputy Commissioner of Trials, the Honorable Nancy R. Ryan, found Plaintiff not guilty of the sexual abuse allegations (JA 492).  In a decision dated August 23, 2021, Judge Ryan determined that based upon B.M.'s forensic interview, the Tribunal could not "be confident" of B.M's reliability, primarily because she "could not assure the interviewer from Safe Horizon that she would not lie to her" and never "clearly verbalize[d] her promise" to follow the interviewer's suggestion that she decline to answer rather than lie (JA 492, 830).   Judge Ryan further noted that while that might "have been sufficient to continue an intake interview" it fell "far short of an affirmative commitment to tell the truth as is required at an administrative tribunal" (JA 830).

---

[11] The other related to Plaintiff's act in allegedly representing himself as a member of the Special Victims' Division while on suspension duty status in order to gain information on a personal matter (JA 492, 484).  This related to Plaintiff's effort to obtain his attendance records from "Bounce U," a children's trampoline park, relevant to disputing a Family Court allegation that Plaintiff took B.M. there in violation of the order of protection (JA 497).

In addition, the decision noted "another troubling aspect" in the "way the incidents [B.M.] describes continue to escalate throughout the interview" (JA 831). The decision noted, *inter alia*, that the initial disclosure involved just one incident but became about many, in which B.M. seemed to "embellis[h] stories as a means to continue the interview" (JA 831). B.M. did not seem upset and failed to make eye contact during "serious parts of conversation" (JA 831). And, finally, there was no corroboration of any of her allegations (JA 831).[12]

Nevertheless, on November 15, 2021, Plaintiff was dismissed from the New York City Police Department (JA 836, 856).

### The Summary Judgment Motion and the Court's Decision

On April 21, 2023, the Defendants moved for summary judgment arguing, in relevant part, that Plaintiff's false arrest and malicious prosecution claims failed because probable cause existed for arrest and prosecution and that, in the alternative, the Defendants were protected by qualified immunity because arguable probable cause justified the arrest (JA 48; Entry 49).

Plaintiff opposed summary judgment on the grounds that there was no probable cause in light of B.M.'s blatant lack of reliability, the defendants'

---

[12] However, Judge Ryan found Plaintiff guilty of the second specification, relating to representing himself as a member of the Special Victims' Division while on suspension duty status, and recommended that Plaintiff be disciplined for this by forfeiting 10 vacation days.

unjustifiable failure to document her refusal to pledge her honesty, and the utter lack of any evidence to corroborate an account by a complainant who admitted she might lie (Entry 51 at 4-5).

In reply, Defendants argued *inter alia*, that there was no record evidence that defendants "intentionally" failed to document B.M.'s discussion about lying in the reports; claimed that it was "irrelevant" in any event because ADA Mirabella had watched the forensic interview video and conducted his own review; and argued that they were entitled to qualified immunity because Plaintiff failed to show that no reasonably competent officer would have acted similarly to Defendants (Entry 54).

The District Court granted summary judgment finding, *inter alia*, that qualified immunity shielded defendants from liability regarding Plaintiff's false arrest and malicious prosecution claims (JA 1003-04). In support of its decision, the court relied on *Doe v. Pisani*, 2023 WL 4240987 (2d Cir. 2023), concluding that "arguable probable cause can exist in child sex-abuse cases even when there is a possible reason to question the account of the child reporting the abuse" (JA 1004-05). And, citing *Pisani*, the court found that despite Plaintiff's argument that B.M. should not have been credited by the police based on her admission that she "sometimes" lied, given her "detailed and consistent account of sexual abuse, it is not possible to conclude that no reasonable officer. . . could have determined that probable cause existed" (JA 1005-06) (citations omitted).

16

## SUMMARY OF THE ARGUMENT

Generally, the account of a complaining witness will establish probable cause to arrest an accused perpetrator. However, an exception to this rule applies for cases where a reasonable officer would draw doubt about the accuser's veracity. There, clearly-established law prohibits officers from making arrests while burying their heads in the sand. Instead, where a reasonable officer would engage in a "further inquiry" before accepting the word of the accuser, probable cause may not rest upon the word of the accuser alone.

This "further inquiry" rule would have little meaning if it did not apply to this case. Here, the Plaintiff was arrested on claims of sexual assault based solely upon the word of a young complainant who refused to pledge her honesty despite multiple requests for such a pledge by law enforcement, and who instead warned the police that she was prone to lie, and that she would lie in this case. Because law enforcement relied exclusively upon the word of this accuser without engaging in further inquiry, and because further inquiry was plainly available to evaluate the accuser's credibility, the District Court's decision to grant Defendants summary judgment and qualified immunity, and thus dismiss Plaintiff's claims for false arrest and malicious prosecution, should be reversed.

## STANDARD

On a motion for summary judgment, the movant bears the burden of establishing that there is no genuine issue of any material fact, and the court must "draw all factual inferences in favor of the party against whom summary judgment is sought, viewing the factual assertions in the material such as affidavits, exhibits, and depositions in the light most favorable to the party opposing the motion." *Rodriguez v. City of N.Y.*, 72 F.3d 1051, 1060 (2d Cir. 1995); *Singer v. Fulton County Sheriff*, 63 F.3d 110, 114 (2d Cir 1995). "If reasonable minds could differ as to the import of the evidence. . . and if there is any evidence in the record from any source from which a reasonable inference in the non-moving party's favor may be drawn, the moving party simply cannot obtain a summary judgment." *R.B. Ventures, Ltd. v. Shane*, 112 F.3d 54, 59 (2d Cir. 1997).

In turn, this Court "review[s] a grant of summary judgment *de novo* to ascertain whether the substantive law was properly applied." *Curley v. AMR Corp.*, 153 F.3d 5, 11 (2d Cir. 1998).

## ARGUMENT

**THE DISTRICT COURT ERRED IN GRANTING DEFENDANTS SUMMARY JUDGMENT ON GROUNDS OF QUALIFED IMMUNITY BASED UPON A DEFENSE-FRIENDLY CONSTRUCTION OF THE FACTS AND IN CONTRAVENTION OF CLEARLY-ESTABLISHED LAW.**

Given B.M.'s pledge to lie and her refusal to tell the truth, clearly-established law provided that her word alone could not give rise to probable cause to effectuate an arrest of Plaintiff-Appellant Jimenez. For the reasons set forth below, the District Court's grant of summary judgment and finding of qualified immunity on the basis of arguable probable cause should, therefore, be reversed.

### A. The Defendants Lacked Both Actual and Arguable Probable Cause.

Probable cause is a complete defense to claims for false arrest or malicious prosecution. *See, e.g., Dickerson v. Napolitano*, 605 F.3d 732, 751 (2d Cir 2010). But while crime victims are generally considered reliable because they can provide a first-hand account of the criminal activity based upon non-hearsay, "officers are not absolutely privileged to arrest upon a charge by any private individual who claims to be a victim." *Mistretta v. Prokesch*, 5 F. Supp. 2d 128, 133 (E.D.N.Y. 1998). Instead, as this Court has repeatedly confirmed, a law enforcement officer may rely on an account given by a witness or complainant as the basis of probable cause only where the circumstances do not "raise doubt as to the person's veracity."

19

*Panetta v. Crowley*, 460 F.3d 388, 395 (2d Cir. 2006); *see also Singer v. Fulton County Sheriff*, 63 F.3d 110, 119 (2d Cir. 1995).

Under clearly-established law, doubts about a complainant's reliability present an exception to the general rule that victim complaints are sufficient to establish probable cause. *Panetta,* 460 F.3d at 395 (quoting *Singer*, 63 F.3d at 119). Indeed, the "failure to make a further inquiry when a reasonable person would have done so may be evidence of a *lack* of probable cause." *See Manganiello v. City of New York*, 612 F.3d 149, 161 (2d Cir. 2010) (emphasis added). Courts in this Circuit have recognized this basic point repeatedly. *See, e.g., Minfee v. City of New York,* 2021 WL 3565864 at 2 (E.D.N.Y. 2021) (under circumstances in which reliability is at issue, "the officer may need to investigate further"); *Allen v. Leonard*, 2020 WL 4587752, at *9 (E.D.N.Y. 2020) (probable cause defeated where issues of complainant's veracity would have led a "reasonable person to have made a further inquiry"); *Sherman v. City of New York*, 2019 WL 2164081, at *8 (E.D.N.Y. 2019) (where officers had "several pieces of information that should have led them to question [witness's] veracity" the failure to further investigate defeated probable cause); *Sankar v. City of New York*, 867 F.Supp.2d 297 (E.D.N.Y. 2012) (where facts would have given any reasonable officer serious cause to doubt the victim's veracity, the "failure to make a further inquiry when a reasonable person would have done so may be evidence of lack of probable cause").

Here, the District Court's grant of summary judgment erred on this clearly-established point.  B.M.'s statements during her forensic interview about her habit of lying, and her startling admission that she actually planned to lie to investigators in this very case, plainly triggered the "further inquiry" standard required by this Court's instruction.  *See Manganiello*, 612 F.3d at 161.  Indeed, to doubt B.M.'s credibility, the "reasonable officer" would not need to rely upon tangential information about her—for such doubt was supplied by B.M. herself, who repeatedly made clear that she would *not* commit to telling the truth.[13]  This case thus flips the ordinary standard of witness credibility on its head:  even if one wanted to accept the word of this complainant wholesale, that itself would defeat probable cause—because B.M.'s own words here included a vow to lie (JA 53, 512; Video Interview at 15:19-15:22).

The best that B.M. offered in terms of honesty was that she understood the inherent unfairness of lying and the consequences that it can yield.  *See* JA 553, 997-98, and Video Interview at 15:30-15:49 (lying "causes consequences"); JA 54, 514; Video interview at 16:05-16:08 (acknowledging that a request for truth is "fair").

---

[13] See JA 53, 510, Video Interview at 13:58-14:05 (stating "I don't know" if she could tell the truth and that "[i]t depends"); JA 5, 511, and Video Interview at 14:54-56 (asked to promise she would tell the truth, responding "I don't understand"); JA 53, 511, and Video Interview at 15:08-15 (asked again to commit to honesty, responding "I'm not sure" and it "depend[s] on what the question is"); JA 53, 512 and Video Interview at 15:27-29 (admitting she does not "usually tell the truth"); JA 53, 512 and Video Interview at 15:13-5:22 (affirmatively acknowledging that "there [will] be a time when [she] would tell [Ms. Fazio] a lie or tell [her] not the truth").

But in context, these acknowledgments make B.M.'s disposition to lie only more troubling—for despite her knowledge of these baselines, she admitted, she does not "usually tell the truth" (JA 53, 512; Video Interview at 15:27-15:29). If there is any meaning to the "further inquiry" requirement in cases of objectively questionable credibility, then it should have blossomed in this case before the District Court— where, instead, summary judgment was granted based upon the word of the complainant alone.[14]

Ordinarily, the "reasonable person" standard requires courts to delve into an abstraction of how a hypothetically prudent person would behave. But here, the District Court's task was alleviated by developments in the real world. This same set of facts was presented to an entire panel of grand jurors. And though the saying goes that a Grand Jury could be convinced to "indict a 'ham sandwich'" (*United States v. Laurent*, 861 F. Supp2d 71, 89 [E.D.N.Y. 2011]), it would not indict the Plaintiff here. This finding against probable cause was then reinforced in the departmental proceedings, where Judge Ryan also held that B.M. was unreliable

---

[14] This case could have been viewed through an alternative prism, as well—that despite her lip-service to the moral underpinnings of telling the truth, a factual question emerged over whether B.M. actually appreciated those underpinnings. *See Brown v. Ristich*, 36 N.Y.2d 183, 189 (1975) (one goal of oath-taking is to "awaken the witness to his moral duty to tell the truth"). *Cf. People v. McDaniel*, 165 A.D.2d 817 (2d Dept. 1990) (child witness deemed to understand the "[m]oral duty to tell the truth" where the child feared divine retribution for lying, understood it was wrong to lie and could be punished for lying, and otherwise knew it was "incumbent upon her to tell the truth" in court, promising she would not lie).

because B.M. "could not assure the interviewer from Safe Horizon that she would not lie to her" and instead said she "would lie" (JA 492, 830), because "the incidents [B.M.] describe[d] continue[d] to escalate throughout the interview" (JA 831), because the initial disclosure involved just one incident but became about many, in which B.M. seemed to "embellis[h] stories as a means to continue the interview" (JA 831), because B.M. did not seem upset and failed to make eye contact during "serious parts of conversation" (JA 831), and, finally, because there was no corroboration of any of her allegations (JA 831). This independent assessment of B.M.'s reliability, all part of the record before the District Court, should have at least advised its "reasonable person" determination.

The underbelly of this improper arrest and prosecution is not just the failure to attempt corroboration, but the ease with which corroboration could have been sought. According to B.M., the Plaintiff's children and B.M.'s own cousin allegedly witnessed sexually-based encounters—yet were not interviewed; B.M. allegedly suffered a pair of ripped jeans in another encounter, yet these clothes were not sought; and while B.M. claimed the existence of an inculpatory recording and text messages, the police did not attempt to obtain these either. Instead the Defendants ignored these leads, choosing to hold their noses while accepting B.M.'s allegations

wholesale—precisely what clearly established law does not allow.[15]  *Allen*, 2020 WL 4587752 at 9 (probable cause defeated where issues of complainant's veracity would have led a "reasonable person to have made a further inquiry"); *Sankar*, 867 F.Supp.2d at 306 (where facts would have given any reasonable officer serious cause to doubt the victim's veracity, the "failure to make a further inquiry when a reasonable person would have done so may be evidence of lack of probable cause") (citations omitted).[16]

Ultimately, the fundamental defects regarding B.M.'s veracity as a witness precluded a finding of probable cause, and clearly established law removed this question from being "arguable."  *See, e.g., Panetta v. Crowley*, 460 F.3d 388, 395 (2d Cir. 2006); *Singer v. Fulton County Sheriff*, 63 F.3d 110, 119 (2d Cir. 1995). The order granting summary judgment should be reversed.

---

[15]  Nor did these Detectives ever ask B.M.'s parents about her tendency to lie or her general credibility.  Of course, if they had, they would have learned that her mother knew her to be a habitual liar, and that neither parent believed her accusations against Plaintiff (JA 654-55, 657, 660).

[16]  Nor do the unexplained hearsay notations in the Investigative Log establish that defendants sought independent corroboration.  Notably, when Denis was asked if she could corroborate any of the allegations she said "No.  I didn't have any other witnesses" (JA 562).  She was asked if she could corroborate with physical evidence and she answered, "Due to the timing of her outcry, there was no physical evidence" (JA 563).  When asked whether she was able to corroborate B.M.'s allegation that Plaintiff recorded her on the beach, Detective Denis answered, "there wouldn't have been an outside source" (JA 569-70).  As to whether she ever sought evidence from Plaintiff's phone—including texts or recordings—she testified that she did not (JA 570-71).  She did not know if anyone from IAB attempted to do so (571). Sergeant Wancique also testified that there were no witnesses available to corroborate B.M.'s allegations (JA 627-28), and that these kinds of crimes typically happen without witnesses (JA-628-29).

**B. The Defendants Were Not Entitled to Qualified Immunity on Summary Judgment.**

For purposes of civil rights claims arising under Section 1983 of Title 42, "[q]ualified immunity shields government officials performing discretionary functions from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Zellner v. Summerlin*, 494 F.3d 152, 155 (2d Cir. 2007). In certain close cases, showing that the constitutional line was "clearly established" can require relevant case law to prove the point; but "in an obvious case, [general standards of law] can 'clearly establish' the answer, even without a body of relevant case law." *Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 6 (2021).

Evaluating these qualified immunity principles on summary judgment requires one more wrinkle. That is, the qualified immunity standards must be evaluated through a construction of the facts that gives the non-movant the benefit of every favorable inference. *See, e.g., Simons v. Fitzgerald*, 287 Fed. Appx. 924 (2d Cir. 2008) (denying qualified immunity at summary judgment, noting "the facts we must assume to be true"); *Annan v. City of New York Police Dept.*, 2015 WL 5552271, at *7 (E.D.N.Y. 2015) (citing case law "vacating district court's award of summary judgment on qualified immunity, in part, because district court failed to view the record in the light most favorable to the nonmoving party"). After all, "summary judgment on qualified immunity grounds is not appropriate when there

are facts in dispute that are material….” *Pal v. Cipolla*, 2022 WL 766417, at *3 (2d Cir. 2022).

Granting Jimenez all favorable inferences here, summary judgment was not appropriate because relevant case law showing the wrongfulness of Defendants’ conduct was “clearly established.” In particular, consider this Court’s 2014 decision in *McGee v. Doe*, 568 Fed. Appx. 32 (2d Cir. 2014)—precedent that, by the time the District Court decided Jimenez’s fate, had been on the books for nearly a decade.

In *McGee*, an alleged victim had made inculpatory statements against an alleged perpetrator, but the complainant spoke “little English,” “no interpreter was present,” the statement itself was “brief, sparsely detailed, and vague on essential facts,” and it appeared that portions of the witness’s statement had been filled out by an officer. Given the accusation from an alleged victim, the District Court dismissed the arrestee’s Fourth Amendment claims, but this Court reversed, using logic squarely applicable here:

> It is well established that a law enforcement official has probable cause to arrest if he received his information from some person, normally the putative victim or eyewitness. However, the victim-informant must be credible, and can only be relied upon absent circumstances that raise doubts as to the victim’s veracity. … [H]ere, [the plaintiff had] alleged facts that, if true, indicate[d] that any reasonably competent officer should have known that [the witness] was an unreliable victim-informant whose

> statement, under the circumstances, could not form the
> sole basis for an arrest.

*McGee*, 568 Fed. Appx. at 37-38 (internal quotations and references omitted). *See also Panetta v. Crowley*, 460 F.3d 388, 395 (2d Cir. 2006); *Singer v. Fulton County Sheriff*, 63 F.3d 110, 119 (2d Cir. 1995).

With a witness here who is *far* less credible than the witness in *McGee*—a witness who explicitly refused to pledge honesty, warned that she was a habitual liar, and affirmatively acknowledged that she would lie to investigators here—the same outcome is warranted: reversal of the District Court's finding of qualified immunity.

### C. The District Court Erred in Relying Upon *Doe v. Pisani*, 2023 WL 4240987 (2d Cir. 2023).

Instead of applying established precedent that precludes the police from exclusively relying on an unreliable crime victim's report as the sole basis of probable cause, the District Court erroneously relied on *Doe v. Pisani*, 2023 WL 4240987 (2d Cir. 2023) (JA 1003-06), a case readily distinguishable from the case at bar. Relying on the reasoning of *Pisani*, the District Court found that "arguable probable cause can exist in child sex-abuse cases even when there is a possible reason to question the account of the child reporting the abuse" where the child's account is "largely consistent" (JA 1004-05). *Pisani*, however, did not support this conclusion in this case.

First, *Doe v. Pisani*, 2023 WL 4240987 (2d Cir. 2023), involved a neutral magistrate's determination that probable cause existed to issue an arrest warrant. Here, there was no warrant for Plaintiff's arrest and, therefore, the presumption of reasonableness that applied to the warrant in *Pisani*, that had issued "only upon a showing of probable cause" determined by a neutral magistrate, simply does not apply here. *Id*. at 3, citing *Walczyk v. Rio,* 496 F.3d 139, 155-56 (2d Cir. 2007).[17]

Second, because Plaintiff's arrest in this case was not based upon a warrant, the Defendants bore the burden of proving probable cause as an "affirmative defense" rather than being entitled to probable cause by default. *Dickerson v. Napolitano*, 604 F.3d 732, 751 (2d Cir. 2010); *Allen*, 2020 WL 4587752 at 9.

Third, *Pisani* involved two children's accounts—not a single witness—and their allegations were "largely consistent" with a sworn statement from their mother, details about the children's forensic interviews, and corroborating information from classmates and their parents. There was no such corroboration here from B.M.'s mother or father (neither of whom believed her allegations) nor from any of her classmates or any other information (JA 654-55, 657, 660). Nor were B.M.'s allegations consistent—to the contrary, they changed and evolved throughout her

---

[17] Indeed, the Defendant police officers here made their own probable cause determination. ADA Mirabella testified that he did not tell the police that they had probable cause or otherwise authorize them to arrest Plaintiff. To the extent that Inspector Bogle and Chief Cooper claimed that ADA Mirabella instructed them to arrest Plaintiff, that testimony should be rejected as Plaintiff is entitled to all factual inferences in his favor, and any factual issue this creates should—and must—be resolved at trial.

telling, spinning into wild accusations that were highly improbable if not outright incredible, which bore strong indicia of dishonesty. By way of example of B.M.'s inconsistencies, she reported only a single incident to her guidance counselor and began her interview by telling Ms. Fazio that "it" happened only once; yet during the course of the lengthy interview that followed, B.M.'s allegations against Plaintiff multiplied exponentially, transforming into numerous incidents (Video of Interview at 23:57-24:01; 24:17-54:44, 1:02:06-1:06:17). The location changed: B.M. reported to her guidance counselor that she had been dry humped on her couch; yet during her forensic interview, she alleged it took place on Plaintiff's bed (JA 51, 83, 508; JA 55; Video Interview at 31:36-32:51; 42:38-43:52). The frequency changed: B.M. initially claimed she had been dry humped once, but then claimed that this happened regularly—in fact, whenever Plaintiff's wife would go to the bathroom, an assertion that lacked credibility on its face (Video of Interview at 32:17-32:24). The circumstances changed: initially, B.M. did not report that anyone else was present during these incidents, but then said that Plaintiff's children had been present during one of the dry humping episodes and her 8-year-old cousin during another (Video Interview at 31:46-32:00; 43:00-43:03; 43:40-43:52).

Fourth, the defects regarding B.M.'s credibility did not just relate to inconsistency, but to her own refusal to commit to telling the truth. Her statements about her predisposition to lie and her intention of lying during the interview went

to the heart of whether she could be considered reliable in the first instance, which is vastly different from types of inconsistencies or discrepancies that will not affect probable cause but might ultimately impact the ability to prove guilt beyond a reasonable doubt. *See Gisondi v. Town of Harrison*, 72 N.Y.2d 280 (1988) (noting that discrepancies in victim's identification and failure to investigate an alibi were not fatal to the probable cause determination even though they could impair ability to prove guilt beyond a reasonable doubt.)

Fifth, in *Pisani*, the warrant included, *inter alia*, the children's largely consistent account following a *full investigation*. *Pisani*, at 1. After the plaintiff there alleged that the arrest warrants had failed to include his son's claim that the interviewer bribed him to lie and other inaccuracies, this Court held that in assessing the probable cause determination, the court should engage in a "correcting process" and "examine all of the information the officers possessed when they applied for the . . . warrant." *Id*. citing *Escalera v. Lunn*, 361 F.3d 737, 743 (2d Cir. 2004). Yet, here, there was no investigation conducted or corroboration obtained. To the contrary, a "correcting process" or full investigation here would have revealed only B.M.'s lack of credibility, propensity for lying, inconsistencies, and a total lack of any corroborative evidence to substantiate any of B.M.'s allegations. Thus, further inquiry would have left the investigation well below the probable cause threshold at the time of Jimenez's arrest.

In sum, *Pisani,* a case about an arrest warrant, a presumption of probable cause, and a consistent account of wrongdoing across multiple witnesses, is not applicable to the circumstances presented here—with no warrant, no presumption, little consistency, and an admission by the complainant herself that she should not be trusted.  The Defendants should have heeded her warning.  And, in turn, the District Court should have denied their motion for summary judgment and permitted Plaintiff's case to proceed to trial.

## <u>CONCLUSION</u>

For these reasons, we respectfully request that the District Court's grant of summary judgment on grounds of qualified immunity be REVERSED.

Dated: May 21, 2024

**BARKET EPSTEIN KEARON
ALDEA & LOTURCO, LLP**

/s/ Donna Aldea
Donna Aldea
Alexander Klein
Melissa S. Horlick
666 Old Country Road, Suite 700
Garden City, New York 11530
(516) 745-1500

*Attorneys for Plaintiff-Appellant*

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME
LIMITATION, TYPEFACE REQUIREMENTS
AND TYPE STYLE REQUIREMENTS**

1. This brief complies with the type-volume limitation of Fed.R.App.P.32(a)(7)(B) because:

   This brief contains 7,702 words, excluding the parts of the brief exempted by Fed.R.App.32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Fed.R.App.P.32(a)(5) and the type style requirements of Fed.R.App.P32(a)(6) because:

   This brief has been prepared in Proportionally-Space typeface using Microsoft Word, in Times New Roman, Font Size 14.

# SPECIAL APPENDIX

i

# Table of Contents

**Page**

Memorandum and Order of Honorable Rachel P. Kovner,
Dated January 18, 2024.............................................................SPA-1

Judgment of The United States District Court Eastern
District of New York, Dated January 19, 2024........................SPA-17

SPA-1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------x

JUAN J. JIMENEZ,

               Plaintiff,

        v.

CITY OF NEW YORK, HUGH BOGLE,
DERBY WANCIQUE,[1] PASCALE
DENIS, VIVENE SIMPSON, GLORY
OKEZIE, and DERMOT F. SHEA,

               Defendants.

**MEMORANDUM AND ORDER**
21-CV-6133 (RPK) (JRC)

------------------------------------------------------x

RACHEL P. KOVNER, United States District Judge:

    Plaintiff Juan J. Jimenez filed this lawsuit under 42 U.S.C. § 1983 alleging false arrest, malicious prosecution, and retaliation in violation of the First Amendment. Defendants have moved for summary judgment. For the reasons set forth below, the motion is granted.

## BACKGROUND

### I.   Factual Background

    The following facts are taken from the parties' Rule 56.1 statements and relevant portions of the record and are undisputed unless otherwise noted.

### A. Plaintiff's Arrest and Criminal Prosecution

    In September 2019, B.M., a twelve-year-old child, reported to her school guidance counselor that her neighbor had assaulted her in his apartment after the neighbor's wife and children went to bed. Pl.'s Rule 56.1 Counterstatement ¶ 9 (Dkt. #52); Decl. of Caroline McGuire (Dkt. #50), Ex. B ("Investigative Log") 14 (ECF Pagination) (Dkt. #50-2). According to B.M.'s

---

[1] Plaintiff's complaint spells defendant Derby Wancique's last name "Wanccique." Am. Compl. 1 (Dkt. #15). But because defendant's summary judgment brief uses "Wancique," Defs.' Mem. of Law in Supp. of Mot. for Summ. J. ("Defs.' MSJ") 1 (Dkt. #49), I adopt that spelling.

guidance counselor, B.M. reported that her neighbor "pinned her on the couch and stated, 'I'm going to [d]ry [h]ump you,'" "reached under her shirt and grabbed her breast," and "tried to kiss her."   Investigative Log 14.   B.M. also told her guidance counselor that her neighbor was a detective.  *Ibid.*; Pl.'s Rule 56.1 Counterstatement ¶ 10.   After the guidance counselor reported B.M.'s disclosure to the police, the police confirmed that plaintiff was a detective for the New York City Police Department ("NYPD") and lived in B.M.'s apartment building.  Pl.'s Rule 56.1 Counterstatement ¶¶ 11–12.

That same day, a forensic specialist interviewed B.M. at the Brooklyn Child Advocacy Center.  *Id.* ¶ 17.   NYPD Detective Pascale Denis and NYPD Sergeant Derby Wancique observed, but did not participate in, the interview.  *Id.* ¶ 19.   Glory Okezie, a Child Protective Specialist with the Administration for Child Services ("ACS"), also observed the interview.  *Ibid.*

During the interview, the forensic specialist asked B.M. questions about her ability to tell the truth.   When she first asked B.M. whether she could "promise . . . to tell the truth," B.M. responded that she "d[idn't] know."  *Id.* ¶ 20.   The forensic specialist then asked whether she "promise[d] the answer [she] give[s] . . . will be true," to which B.M. responded that she didn't understand.  *Id.* ¶ 21.   The forensic interviewer repeated: "[D]o you promise the answer you give me will be true?"  *Id.* ¶ 22.   B.M. then answered: "Yes.  Depending on what the question is.  I'm not sure."  *Ibid.*   The forensic interviewer then asked: "[W]ill there be a time when you would tell me a lie or tell me not the truth?"  *Id.* ¶ 23.   B.M. responded: "Yes, I am being honest."  *Ibid.*

The forensic interviewer continued asking B.M. questions about telling the truth. Specifically, she asked B.M. "what about telling the truth feels hard."  *Id.* ¶ 24.   B.M. responded: "I don't usually tell the truth but like I know it causes conflicts but it's just over my teachers of course.  So like I have to tell the truth.  But like sometimes I just tell them [no] if I want to.  Like

SPA-3

I'm not sure if I actually want to say that.  It depends on what the question is." *Ibid.*  The forensic interviewer then stated: "I would only ask that . . . if there's something you don't want to answer rather than telling me something that's not the truth, just tell me I don't wanna say that word." *Id.* ¶ 25.  B.M. responded: "Uh-huh." *Ibid.*  Finally, the forensic interviewer asked whether that sounded "fair," and B.M. responded "[y]es." *Id.* ¶ 26.

The forensic interviewer proceeded to ask B.M. questions about plaintiff.  *See id.* ¶¶ 27–40.  In their Rule 56.1 statements, the parties agree that B.M. made the following allegations against plaintiff[2]:

- B.M. stated that on one occasion, plaintiff grabbed her, hugged her, and asked her to give him a kiss on the mouth. *Id.* ¶ 27.
- B.M. stated that plaintiff "always grabs [her] butt" and "tries to pull [her] pants down" when she helps his children with their homework. *Id.* ¶ 28.
- B.M. stated that plaintiff "forces [her] to pull [her] pants down" and "[her] bra." *Id.* ¶ 29.
- B.M. stated that on one occasion plaintiff "dry humped" her on his bed. *Id.* ¶ 33.
- B.M. stated that plaintiff kisses her. *Id.* ¶ 34.
- B.M. stated that on one occasion, plaintiff pulled her pants down and that her pants ripped while it happened. *Id.* ¶ 35.
- B.M. stated that plaintiff started "grabbing her butt" when she was eleven years old. *Id.* ¶ 36.
- B.M. stated that when plaintiff pulls her pants down, her underwear is sometimes down too. *Id.* ¶ 37.
- B.M. stated that plaintiff tried to pull her bra down and groped her. *Id.* ¶ 38.
- B.M. stated that plaintiff changes his clothes in front of her after he "finishes taking a bath." *Id.* ¶ 40.

Plaintiff was arrested and charged with first-degree sexual abuse, forcible touching, endangering the welfare of a child, and second-degree sexual abuse of a minor.  *Id.* ¶¶ 53, 57.  NYPD Deputy Inspector Hugh Bogle was instructed to arrest plaintiff.  *Id.* ¶ 55.  An arrest report also lists Sergeant Wancique as the arresting officer.  *Id.* ¶ 54.

---

[2] Defendants have also submitted a video of B.M.'s interview.  But "[a] court is not required to consider what the parties fail to point out in their Local Rule 56.1 statements." *24/7 Recs., Inc. v. Sony Music Ent., Inc.*, 429 F.3d 39, 46 (2d Cir. 2005) (quoting *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir. 2001)).  I therefore consider only the statements from B.M.'s interview that the parties identified in their Rule 56.1 statements.

3

SPA-4

The District Attorney's Office filed a criminal complaint against plaintiff, which was signed by Detective Denis. *Id.* ¶ 58. Plaintiff was arraigned, and an order of protection limiting his contact with B.M. was issued. *Id.* ¶¶ 59–60. A grand jury ultimately declined to indict plaintiff, and the District Attorney's Office dismissed the criminal charges against him. *Id.* ¶¶ 61–62.

**B. Family Court Proceedings**

On the same day that B.M. made her accusation to her guidance counselor, ACS opened an investigation. *See id.* ¶ 65. As part of the investigation, Ms. Okezie both attended B.M.'s interview at the Brooklyn Child Advocacy Center and spoke to B.M.'s neighbors and family. *Id.* ¶¶ 68–70.

A few days after the investigation commenced, ACS hosted a child safety conference. *Id.* ¶ 72. Ms. Okezie and her supervisor, Vivene Simpson, attended, as did B.M.'s parents. *Id.* ¶¶ 64, 73. At the conclusion of the conference, a representative of ACS indicated that ACS would file a petition on behalf of B.M. pursuant to Article 10 Of the New York Family Court Act. *See id.* ¶ 74. An Article 10 petition initiates a proceeding in family court based on "facts sufficient to establish that a child is abused or neglected." N.Y. Fam. Ct. Act. § 1031. A representative of ACS further indicated it would seek an order of protection against plaintiff on behalf of B.M. Pl.'s Rule 56.1 Counterstatement ¶ 74.

The same day, ACS hosted another child safety conference, this time with Ms. Simpson, Ms. Okezie, plaintiff, and plaintiff's wife. *Id.* ¶ 76. Although plaintiff's children had not themselves made any allegations of abuse against plaintiff, *id.* ¶ 85, at the conclusion of the conference, a representative of ACS indicated that ACS would file additional Article 10 petitions against plaintiff on behalf of plaintiff's two children, *id.* ¶ 77.

Lawyers at ACS then filed three Article 10 petitions against plaintiff, one on behalf of B.M.

4

and two on behalf of plaintiff's children. *Id.* ¶¶ 79–83. Ms. Okezie was listed as the deponent on the petitions for plaintiff's children. *Id.* ¶¶ 81, 83. The record does not indicate whether any ACS official was listed as a deponent on the petition for B.M. *See id.* ¶¶ 79–83.

After ACS filed the Article 10 petitions, plaintiff's two children reported to Brooklyn Child Advocacy Center for forensic interviews. *Id.* ¶ 84. Neither of plaintiff's children made any allegations against him during the interviews. *Id.* ¶ 85.

Several months later, ACS withdrew the Article 10 petitions for plaintiff's children, and a family court judge dismissed those petitions without prejudice. *Id.* ¶ 89. The record does not indicate whether or how the Article 10 petition for B.M. was resolved. *See ibid.*

**C. Plaintiff's Dismissal from the NYPD**

After B.M. made her accusation against plaintiff, the NYPD suspended plaintiff's employment. *See id.* ¶ 95. At some point during plaintiff's suspension, B.M. alleged that plaintiff violated the order of protection against her by taking her to an indoor trampoline park. Decl. of Caroline McGuire, Ex. Q ("Pl.'s Personnel File") 10 (ECF Pagination) (Dkt. #50-16). An emergency court session was held, during which plaintiff denied violating the order. *See ibid.* While on a break from the court session, plaintiff went to the trampoline park and requested his record of attendance. *Ibid.* Defendants allege that plaintiff represented himself as a detective when requesting this evidence, though plaintiff denies doing so. Pl.'s Rule 56.1 Counterstatement ¶ 96.

The NYPD brought disciplinary charges against plaintiff. *See* Pl.'s Personnel File 7. Specifically, the NYPD charged plaintiff with "us[ing] his hand to touch the buttocks" of a minor and "represent[ing] himself as an on-duty" officer "to gain information regarding . . . his own personal matter unrelated to" the NYPD. *Id.* at 8.

SPA-6

At a disciplinary hearing, an Assistant Deputy Commissioner found plaintiff not guilty of touching a minor inappropriately but guilty of wrongfully representing himself as an on-duty officer.   Pl.'s Rule 56.1 Counterstatement ¶ 104.   The Assistant Deputy Commissioner recommended that the NYPD require plaintiff to forfeit ten vacation days.  *Id.* ¶ 106.

NYPD Commissioner Dermot Shea reviewed the Assistant Deputy Commissioner's report and recommendation.  Pl.'s Personnel File 3.  Commissioner Shea declined to adopt the Assistant Deputy Commissioner's recommendation and instead dismissed plaintiff from the NYPD.  *Id.* at 5.  Commissioner Shea noted that plaintiff had previously "conducted an investigation, while off-duty, concerning a matter in which he was personally involved."  *Id.* at 4.  Commissioner Shea was referring to a separate incident in which plaintiff, while off-duty, stopped and held at gunpoint five teenagers who he believed to be involved in an assault against his father.  Pl.'s Rule 56.1 Counterstatement ¶¶ 98–101.

Prior to his dismissal from the NYPD, plaintiff filed a claim with the New York City Comptroller's Office, alleging that he had been falsely arrested and wrongly subjected to Article 10 petitions for child abuse and neglect.  *Id.* ¶ 107.  He also granted an interview to the New York Daily News, again complaining that he had been falsely arrested, and both the New York Daily News and the New York Post published stories about his arrest.  *Id.* ¶ 109.

## II.   Procedural Background

Plaintiff filed this lawsuit under 42 U.S.C. § 1983 against Deputy Inspector Bogle, Sergeant Wancique, Detective Denis, Ms. Simpson, Ms. Okezie, Commissioner Shea, and the City of New York.  *See* Am. Compl. (Dkt. #15).  He brings false arrest and malicious prosecution claims pertaining to his arrest and prosecution on criminal charges against Deputy Inspector Bogle, Sergeant Wancique, and Detective Denis.  *Id.* ¶¶ 35–42.  He also claims that Ms. Simpson and Ms.

6

SPA-7

Okezie "maliciously prosecuted him in Family Court with legally baseless Article 10 petitions." *Id.* ¶ 45; *see id.* ¶¶ 43–46. In addition, he brings a First Amendment retaliation claim against Commissioner Shea, alleging that Commissioner Shea fired him for complaining of wrongful arrest and related police misconduct. *Id.* ¶¶ 53–58; *see id.* ¶ 34. Finally, plaintiff claims that the City of New York is liable for his arrest, criminal prosecution, and family court proceedings under *Monell v. Department of Social Services*, 436 U.S. 658 (1978). Am. Compl. ¶¶ 47–52.

Defendants have moved for summary judgment on all claims. *See* Defs.' Mem. of Law in Supp. of Mot. for Summ. J. ("Defs.' MSJ") (Dkt. #49).

## STANDARD OF REVIEW

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "An issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Frost v. N.Y.C. Police Dep't*, 980 F.3d 231, 242 (2d Cir. 2020) (quoting *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009)). "A fact is material if it might affect the outcome of the suit under the governing law." *Ibid.* The movant bears the burden of "demonstrat[ing] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

In determining whether there is a genuine issue of material fact, I evaluate the whole record, resolving all ambiguities and drawing all permissible factual inferences in favor of the non-movant. *Tracy v. Freshwater*, 623 F.3d 90, 95 (2d Cir. 2010). "It is a settled rule that credibility assessments, choices between conflicting versions of the events, and the weighing of evidence are matters for the jury, not for the court on a motion for summary judgment." *McClellan v. Smith*, 439 F.3d 137, 144 (2d Cir. 2006) (quotation marks, alteration, and citation omitted). A nonmoving

SPA-8

party can survive summary judgment only if there is sufficient evidence to permit a rational trier of fact to find in that party's favor. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986). In other words, "[t]he litigant opposing summary judgment . . . may not rest upon mere conclusory allegations or denials as a vehicle for obtaining a trial." *Quinn v. Syracuse Model Neighborhood Corp.*, 613 F.2d 438, 445 (2d. Cir. 1980) (quotation marks and citation omitted).

## DISCUSSION

Defendants' motion for summary judgment is granted.

**I.    Deputy Inspector Bogle, Sergeant Wancique, and Detective Denis Are Entitled to Qualified Immunity for False Arrest and Malicious Prosecution.**

Qualified immunity shields Deputy Inspector Bogle, Sergeant Wancique, and Detective Denis from liability on plaintiff's false arrest and malicious prosecution claims, because at least arguable probable cause supported plaintiff's arrest and criminal prosecution.

As a general matter, probable cause at the time of arrest is a complete defense to a claim of false arrest, *Betts v. Shearman*, 751 F.3d 78, 82 (2d Cir. 2014), and to a claim of malicious prosecution so long as there is no "indication that the authorities became aware of exculpatory evidence between the time of the arrest and the subsequent prosecution that would undermine the probable cause which supported the arrest," *Rae v. County of Suffolk*, 693 F. Supp. 2d 217, 226 (E.D.N.Y. 2010) (quotation marks and citation omitted); *see ibid.* ("Plaintiff has . . . failed to dissipate the probable cause that was present at the time of his arrest, and . . . therefore . . . there was also probable cause for [his prosecution]."); *Betts*, 751 F.3d at 82.

Probable cause exists in the false arrest context when an officer has "knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested," *Fabrikant v. French*, 691

8

SPA-9

F.3d 193, 214 (2d Cir. 2012) (quoting *Panetta v. Crowley*, 460 F.3d 388, 395 (2d Cir. 2006)), and exists in the malicious prosecution context under the "essentially . . . same" inquiry "in light of the facts known or believed at the time the prosecution is initiated, rather than at the time of arrest," *Danielak v. City of New York*, No. 02-CV-2349 (KAM), 2005 WL 2347095, at *10 (E.D.N.Y. Sept. 26, 2005) (quotation marks and citation omitted), *aff'd*, 209 F. App'x 55 (2d Cir. 2006).

Qualified immunity, in turn, shields officers from liability for false arrest under Section 1983 so long as "arguable probable cause" existed "to arrest the plaintiff." *Myers v. Patterson*, 819 F.3d 625, 632 (2d Cir. 2016) (quotation marks omitted) (quoting *Garcia v. Does*, 779 F.3d 84, 92 (2d Cir. 2014)). And qualified immunity provides the same shield against claims of malicious prosecution so long as no "intervening fact" caused the "arguable probable cause" justifying the arrest to "dissipate" before the criminal proceeding was commenced. *Gaston v. City of New York*, 851 F. Supp. 2d 780, 793 (S.D.N.Y. 2012) (quotation marks omitted) (quoting *Lowth v. Town of Cheektowaga*, 82 F.3d 563, 571 (2d Cir. 1996)). Arguable probable cause exists if either (i) "it was objectively reasonable for the officer to believe that probable cause existed," or (ii) "officers of reasonable competence could disagree on whether the probable cause test was met." *Myers*, 819 F.3d at 633 (quoting *Escalera v. Lunn*, 361 F.3d 737, 743 (2d Cir. 2004)).

The Second Circuit's recent application of these principles in *Doe v. Pisani*, No. 21-2847, 2023 WL 4240987 (2d Cir. June 29, 2023), indicates that arguable probable cause can exist in child sex-abuse cases even when there is a possible reason to question the account of the child reporting the abuse. The defendant officers in *Pisani* arrested a parent based on abuse allegations from his daughter and son, which the children made first to the children's mother and then to state investigators. The Second Circuit found the children's "firsthand accounts of their alleged abuse, which were largely consistent with a sworn statement from their mother" recounting the allegations

9

the children made to her were "sufficient to establish arguable probable cause," notwithstanding one of the children's "various recantations," the plaintiff's "protestations of innocence, and the opinions of various mental health professionals that [the plaintiff] did not molest the children." *Id.* at *4. The Court explained that those pieces of evidence "establish[ed] only 'conflicting accounts,' which do not negate arguable probable cause 'where an . . . officer chose to believe' one credible account over others." *Ibid.* (citation omitted). The Court relied in part on *Smith v. Edwards*, 175 F.3d 99 (2d Cir. 1999), which it described as finding probable cause "where a child reported sexual abuse to her mother and various others and her mother provided a sworn statement confirming the same." *Pisani*, 2023 WL 4240987, at *4 (citing *Smith*, 175 F.3d at 106). Granting qualified immunity at the summary judgment stage, the Court concluded it was not possible to "say that *no reasonable officer*, out of the wide range of reasonable people who enforce the laws in this country, *could have* determined that probable cause existed." *Ibid.* (quotation marks, alteration, and citation omitted).

The principles in *Pisani* indicate that plaintiff's arrest and prosecution were similarly supported by probable cause. Like the child complainants in *Pisani*, the child complainant here made several reports of sexual abuse, which were largely consistent with each other. B.M. first reported to her guidance counselor that plaintiff pinned her to his couch, told her he would assault her, grabbed her breast, and tried to kiss her. *See* Investigative Log 14. B.M. then stated in her forensic interview that plaintiff had grabbed her and tried to kiss her, *see* Pl.'s Rule 56.1 Counterstatement ¶ 27, and that he had assaulted her on his bed, *see id.* ¶ 33. Notwithstanding minor variations, those reports were mostly consistent with one another. Plaintiff argues that the officers were not entitled to credit B.M.'s disclosures because she admitted in her forensic interview to sometimes lying. Pl.'s Mem. of L. in Opp'n to Defs.' Mot. for Summ. J. ("Pl.'s

10

Opp'n") 4 (Dkt. #51).  But *Pisani* indicates that "largely consistent" accounts from a child sex-abuse complainant can be "sufficient to establish arguable probable cause," even where some questions exist as to the reliability of the complainant's statements.  *Pisani*, 2023 WL 4240987, at *4.  Taking into consideration both B.M.'s colloquy with her interviewer regarding telling the truth, and B.M.'s detailed and consistent account of sexual abuse, it is not possible to conclude that "*no* reasonable officer . . . *could have* determined that probable cause existed." *Ibid.* (quotation marks, alteration, and citation omitted).

Because "arguable probable cause" existed, *Myers*, 819 F.3d at 632 (quotation marks and citation omitted), qualified immunity shields Deputy Inspector Bogle, Sergeant Wancique, and Detective Denis from liability for false arrest.  And because plaintiff points to no "intervening fact" causing the "arguable probable cause" to "dissipate" before the criminal prosecution against him commenced, *Gaston*, 851 F. Supp. 2d at 793, qualified immunity likewise shields Deputy Inspector Bogle, Sergeant Wancique, and Detective Denis from liability for malicious prosecution.

## II.  Ms. Simpson and Ms. Okezie Are Entitled to Qualified Immunity for Malicious Prosecution.

Qualified immunity also shields Ms. Simpson and Ms. Okezie from liability on plaintiff's claim that those defendants "maliciously prosecuted him in [f]amily [c]ourt" by filing "legally baseless" Article 10 petitions.  Am. Compl. ¶ 45.

Qualified immunity attaches "when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *White v. Pauly*, 580 U.S. 73, 78–79 (2017) (per curiam) (quotation marks and citation omitted). While qualified immunity "does not require a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate." *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (per curiam) (citation omitted).  Courts

11

SPA-12

may "grant qualified immunity on the ground that a purported right was not 'clearly established' by prior case law, without resolving the often more difficult question whether the purported right exists at all." *Booker v. Graham*, 974 F.3d 101, 106 (2d Cir. 2020) (citation omitted).

Qualified immunity forecloses plaintiff's malicious-prosecution claim based on Article 10 petitions, because as plaintiff himself acknowledges, it is not clearly established within the Second Circuit that such petitions "can give rise to a federal claim for malicious prosecution of a parent." *Walker v. City of New York*, 621 F. App'x 74, 76 (2d Cir. 2015); *see* Pl.'s Opp'n 7 ("It is not settled in the Second Circuit whether the initiation of child neglect proceedings can give rise to a malicious prosecution claim."). Because federal malicious-prosecution claims arise under the Fourth Amendment, a plaintiff claiming malicious prosecution must show "some deprivation of liberty consistent with the concept of 'seizure.'" *Burg v. Gosselin*, 591 F.3d 95, 97 (2d Cir. 2010) (quoting *Singer v. Fulton County Sheriff*, 63 F.3d 110, 116 (2d Cir. 1995)). The Second Circuit has held that, at a minimum, it is not clearly established that a parent suffers such a deprivation when an abuse or neglect petition is brought against him. *Dabah v. Franklin*, No. 22-845, 2023 WL 3577872, at *4 (2d Cir. May 23, 2023). While a parent has standing to assert an unlawful seizure claim on behalf of a child who was "seized" by the state through a proceeding involving child custody, the Second Circuit has "never recognized any . . . independent Fourth Amendment right of the parent" in the context of a child custody proceeding. *Ibid.* Indeed, in the unpublished decision in *Dabah*, the Second Circuit stated that it read its prior decisions as "entirely foreclos[ing]" a parent from raising a malicious prosecution claim arising out of child-neglect proceedings on his own behalf. *Ibid.* (discussing *Southerland v. City of New York*, 680 F.3d 127, 143 (2d Cir. 2012)). As in *Dabah*, because plaintiff asserts malicious prosecution claims on his own behalf, *see* Am. Compl. ¶¶ 43–46, Ms. Okezie and Ms. Simpson are "at a minimum . . .

12

SPA-13

entitled to qualified immunity" on plaintiff's claims against them, *Dabah*, 2023 WL 3577872, at *4.

### III.   Commissioner Shea Is Entitled to Summary Judgment on Plaintiff's First Amendment Claim.

Plaintiff's First Amendment retaliation claim against Commissioner Shea fails because plaintiff has not put forth evidence from which a reasonable jury could infer that Commissioner Shea fired plaintiff in retaliation for protected speech—namely, plaintiff's filing of a complaint with the New York City Comptroller's Officer and his interview with a member of the press.  *See* Am. Compl. ¶¶ 32–33, 53–58.  To succeed on a First Amendment retaliation claim under Section 1983, a plaintiff "must demonstrate by a preponderance of the evidence that the [speech or conduct] at issue was protected, that he suffered an adverse employment action, and that there was a causal connection between the protected [speech or conduct] and the adverse employment action."  *Matusick v. Erie Cnty. Water Auth.*, 757 F.3d 31, 47 (2d Cir. 2014) (quotation marks omitted) (quoting *Blum v. Schlegel*, 18 F.3d 1005, 1010 (2d Cir. 1994)).

Plaintiff has not set out evidence from which a jury could find a causal connection between his complaint and interviews and his termination from the NYPD, because he has not put forward evidence that "it is at least plausible that [Commissioner Shea was] aware of" his protected speech "and that [the plaintiff's firing] was motivated by" that speech.  *Odermatt v. N.Y.C. Dep't of Educ.*, 694 F. App'x 842, 845 (2d Cir. 2017).  The only evidence of a causal connection that plaintiff identifies is the short period of time that elapsed between the allegedly protected speech and his termination.  *See* Pl.'s Opp'n 12–13.  Specifically, Commissioner Shea terminated plaintiff's employment seventeen days after plaintiff filed his complaint and sixteen days after the New York Daily News published a story for which plaintiff was interviewed.  *Ibid.*  But "while factfinders can infer a causal connection from the temporal proximity of protected speech to a challenged

13

employment action, that inference is only permissible if there is reason to believe that the decisionmakers taking the allegedly retaliatory action were aware of the plaintiff's protected speech." *Schulz v. Commack Union Free Sch. Dist.*, No. 21-CV-5646 (RPK) (ST), 2023 WL 2667050, at *8 (E.D.N.Y. Mar. 28, 2023) (citation omitted); *see Pavone v. Puglisi*, 353 F. App'x 622, 625 (2d Cir. 2009) ("Although a causal connection between an adverse action and protected speech may be indirectly established by showing that protected activity was followed closely in time by the adverse action, a plaintiff must still allege that defendants were aware of the protected activity." (citations omitted)); *see Catanzaro v. City of New York*, 486 F. App'x 899, 901 (2d Cir. 2012) (holding that plaintiffs failed to establish the causal-connection element at the summary judgment stage where they had "not presented any evidence that defendants were aware of" their protected speech).

Because plaintiff does not allege or point to any evidence that Commissioner Shea was aware of his statements criticizing the government's actions relating to the child-abuse allegations, plaintiff has failed to establish a *prima facie* retaliation case. *See, e.g., 41 N. 73 W., Inc. v. County of Westchester*, No. 08-CV-4523 (CS), 2009 WL 10740050, at *10 (S.D.N.Y. Sept. 29, 2009) (dismissing a First Amendment retaliation claim because, among other reasons, plaintiff failed "to state with any specificity [when, where, how, or which defendants] were informed" of the allegedly protected activity); *Schulz* 2023 WL 2667050, at *8 (similar); *Knight v. Nassau County*, No. 17-CV-0958 (SFJ) (SIL), 2020 WL 4207439, at *12 (E.D.N.Y. July 22, 2020), *aff'd*, 852 F. App'x 42, 43 (2d Cir. 2021) (similar); *Brady v. County of Suffolk*, 657 F. Supp. 2d 331, 356 (E.D.N.Y. 2009) (similar). Commissioner Shea is accordingly entitled to summary judgment.

## IV. The City of New York Is Entitled to Summary Judgment.

Plaintiff's *Monell* claim against the City of New York fails because plaintiff has not put

14

forth evidence from which a reasonable jury could infer that city employees violated his constitutional rights pursuant to an official policy or custom.

A municipality such as the City of New York can be liable under Section 1983 only if an "action pursuant to official municipal policy of some nature" caused the alleged deprivation of the plaintiff's rights. *Monell*, 436 U.S. at 691; *see Connick v. Thompson*, 563 U.S. 51, 60–61 (2011). Municipalities "are not vicariously liable under [Section] 1983 for their employees' actions." *Connick*, 563 U.S. at 60. A plaintiff who seeks to hold a municipality liable under Section 1983 must allege (i) "an official policy or custom," that (ii) "cause[d] the plaintiff to be subjected to," (iii) a "denial" of a federally guaranteed right. *Wray v. City of New York*, 490 F.3d 189, 195 (2d Cir. 2007). A plaintiff can allege a municipal policy or custom by pointing to "decisions of a government's lawmakers, the acts of its policymaking officials, . . . practices so persistent and widespread as to practically have the force of law" or, "[i]n limited circumstances, a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights." *Connick*, 563 U.S. at 61 (citations omitted). But isolated acts "by non-policymaking municipal employees are generally not sufficient to demonstrate a municipal custom, policy, or usage that would justify municipal liability." *Jones v. Town of East Haven*, 691 F.3d 72, 81 (2d Cir. 2012).

Here, the City is entitled to summary judgment because plaintiff has not set forth any evidence from which a jury could find he was harmed pursuant to "an official policy or custom." *Wray*, 490 F.3d at 195. Plaintiff alleges that the City has "'official and un-official' policies of supporting the filing of false arrests and maliciously prosecuting he and other similarly situated individuals without probable cause" in both criminal and family court. Am. Compl. ¶ 49. But his summary judgment brief points to no evidence of such policies. Rather, it contains only the

15

SPA-16

conclusory statement that "based upon the totality of the facts, . . . municipal policymakers exhibited deliberate indifference by failing to properly train, supervise, and discipline" the individual defendants. Pl.'s Opp'n 10–11. At the summary judgment stage, however, "the nonmoving party" must "go beyond the pleadings" and "designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex Corp.*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)). Because plaintiff has failed to do so, the City is entitled to summary judgment.

## CONCLUSION

For the foregoing reasons, summary judgment is granted to defendants on all claims. The Clerk of Court is respectfully directed to enter judgment and close the case.

SO ORDERED.

*/s/ Rachel Kovner*
RACHEL P. KOVNER
United States District Judge

Dated: January 18, 2024
　　　Brooklyn, New York

16

SPA-17

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------ X
JUAN J. JIMENEZ,

               Plaintiff,                        JUDGMENT

           v.                           21-CV-6133 (RPK) (JRC)

CITY OF NEW YORK, HUGH BOGLE,
DERBY WANCIQUE, 1 PASCALE DENIS,
VIVENE SIMPSON, GLORY OKEZIE, and
DERMOT F. SHEA,

               Defendants.
------------------------------------------------------------ X

     A Memorandum and Order of Honorable Rachel P. Kovner, United States District Judge,

having been filed on January 18, 2024, granting summary judgment to defendants on all claims;

it is

     ORDERED and ADJUDGED that summary judgment is granted to defendants on all

claims.

Dated: Brooklyn, NY                   Brenna B. Mahoney
       January 19, 2024           Clerk of Court

                                      By: /s/Jalitza Poveda
                                      Deputy Clerk